UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

**DECISION AND ORDER**

v.

6:19-CR-06074 EAW

GEORGE MOSES,

Defendant.

## I.    **INTRODUCTION**

Defendant George Moses ("Moses") is charged by way of a Fifth Superseding Indictment (hereinafter the "indictment") with 32 separate counts of mail and wire fraud, conspiracy to commit the same, money laundering, federal program bribery and theft, tampering with documents, false statements, and filing false income tax returns.  (Dkt. 123).  Moses has filed a motion to dismiss counts one through five of the indictment on the grounds that they fail to state a crime.  (Dkt. 143).  For the reasons set forth below, the motion is denied.

## II.    **FACTUAL AND PROCEDURAL BACKGROUND**

Moses was originally charged with making false statements in violation of 18 U.S.C. § 1001 by way of a criminal complaint in October 2018.  (Dkt. 1).  The criminal case has now evolved into the 32 pending charges as alleged in the sixth indictment returned against Moses, and it also includes charges against a co-defendant, Janis White ("White").[1]  (Dkt.

---

[1]    With the consent of the parties, the Court has ordered that Moses and White be tried separately.  (Dkt. 121).

123).  Moses' trial has been adjourned several times at the request of his counsel due to the

COVID-19 pandemic, and it is now scheduled to proceed on October 12, 2021.  (Dkt. 150).

With the pending motion, Moses seeks dismissal of counts one through five of the

indictment.  Count one alleges conspiracy to commit mail and wire fraud in violation of 18

U.S.C. § 1349, related to an alleged agreement between Moses and Shirley Boone

("Boone")[2] to defraud the Dormitory Authority of the State of New York ("DASNY"), by

obtaining a $45,000 grant reimbursement from DASNY to the North East Area

Development Inc. ("NEAD"), described in the indictment as "a not-for-profit

neighborhood tax-exempt organization" that Moses served as Executive Director and

Boone served as Chief of Staff, reporting directly to Moses.  (Indictment[3] at Introduction,

¶¶ 1, 7, 13, 17; Count One, ¶¶ 2, 3).  The indictment alleges that Moses and Boone falsely

represented to DASNY that Freedom Community Enterprise, Inc. ("Freedom

Community"), a wholly owned, for-profit subsidiary of NEAD controlled by Moses, "was

hired by NEAD to provide roofing and other rehabilitation services at a cost of $45,000,

when in actuality, Freedom Community was not a construction company, nor did it provide

roofing or other rehabilitation services for NEAD."  (*Id*. at Introduction, ¶ 14; Count One,

¶ 3).

---

[2]      Boone is charged in a separate case and she entered into a plea agreement with the
government, waived indictment, and pleaded guilty to one count of conspiracy to commit
wire fraud in violation of 18 U.S.C. § 1349.  *See United States v. Boone*, No. 6:20-CR-
6087-EAW, Dkt. 4 (W.D.N.Y. July 1, 2020).

[3]      As previously noted, the Fifth Superseding Indictment is filed at Docket 123, and
will hereinafter be referred to in the citations as "Indictment."

The indictment details that on or about June 13, 2016, Moses applied for a $125,000 grant from DASNY on behalf of NEAD for the NEAD Project,[4] which was approved by DASNY on August 7, 2017.  (*Id*. at Count One, ¶¶ 4-7).  Moses then executed the Grant Disbursement Agreement which indicated that "NEAD could apply for reimbursement for expenditures it had incurred and paid in connection the NEAD Project by submitting a Payment Requisition Form and Dual Certification, along with supporting documentation for such expenditures."  (*Id*. at ¶ 8).  The indictment alleges at paragraphs 9 through 16 of count one that the object of the conspiracy was accomplished through the following means and methods:

9.     On or about February 23, 2018, the defendant MOSES authorized and signed a $45,000 check from NEAD to Freedom Community to make it falsely appear that Freedom Community had been paid $45,000 for construction services performed in connection with the NEAD Project.  In actuality, Freedom Community did not perform any services in connection with the NEAD Project.

10.    Between on or about February 28, 2018 and on or about March 5, 2018, a letter signed by the defendant MOSES, on behalf of NEAD, was sent by United States mail to DASNY along with (a) a Payment Requisition Form and Dual Certification form signed by the defendant MOSES which falsely represented that NEAD had paid $45,000 for work purportedly performed in

---

[4]     The indictment alleges that the NEAD Project included expanding the Freedom Market located at 359 Webster Avenue, Rochester, New York, which was operated by Freedom Community, and to "continue renovation of NEAD's corporate headquarters located at 360 Webster Avenue," which included "roof repair, new driveways, interior repair, fencing repair and replacement, and renovation of a storage shed."  (Indictment at Introduction, ¶ 14; Count One, ¶¶ 4-5).

connection with the NEAD Project, (b) a Payment Requisition Back-up Summary form which falsely represented that NEAD had paid $45,000 to Freedom Community for work purportedly performed by Freedom Community in connection with the NEAD Project, (c) a fraudulent invoice in the amount of $45,000 from Freedom Community to NEAD, and (d) a copy of the $45,000 check from NEAD to Freedom Community that made it falsely appear that Freedom Community had been paid $45,000 for construction services performed in connection with the NEAD Project.

11.     On or about March 6, 2018, the defendant MOSES authorized and signed a $45,000 check from Freedom Community back to NEAD to repay NEAD for the $45,000 that the defendant MOSES had previously paid to Freedom Community as part of the scheme and artifice.

12.     On or about March 8, 2018, Shirley Boone sent an email in interstate commerce to DASNY, with a copy to the defendant MOSES, that contained a copy of a bank statement showing that the $45,000 check from NEAD to Freedom Community had been deposited by Freedom Community to trick DASNY into believing that NEAD had in fact paid Freedom Community $45,000 for services performed in connection with the NEAD Project.

13.     On or about March 8, 2018, Shirley Boone also sent an email in interstate commerce to DASNY, with a copy to the defendant MOSES, that contained a copy of a fraudulent Proposal signed by the defendant MOSES on behalf of NEAD, and purportedly signed by Janis White, as president of Freedom Community, which was falsely backdated to September 10, 2017, to trick DASNY into believing that Freedom Community had agreed with NEAD to perform construction services in connection with the NEAD Project.

14.     On or about March 13, 2018, the defendant MOSES sent an email in interstate commerce to DASNY in which he falsely indicated that Freedom Community had in fact provided construction services to NEAD in connection with the NEAD Project, and that Freedom Community was a separate entity from and not associated with NEAD.

15.     On or about June 26, 2018, Shirley Boone sent an email in interstate commerce to DASNY, with a copy to the defendant MOSES, that contained a fraudulent letter from Freedom Community addressed to the defendant MOSES at NEAD, and purportedly signed by Janis White, on behalf of Freedom Community.  The purpose of the fraudulent letter was to falsely represent to DASNY that Freedom Community had in fact completed construction services worth $45,000 in connection with the NEAD Project.

16.     On or about July 16, 2018, as a result of the scheme and artifice, DASNY wire transferred in interstate commerce $45,000 from its bank account to NEAD's M&T Bank . . . account ending 5649, to reimburse NEAD.

 (*Id*. at Count One, ¶¶ 9-16).

Count two alleges mail fraud in violation of 18 U.S.C. §§ 1341 and 2, in connection with the alleged mailings of documents by Moses to DASNY as part of the scheme, as detailed in paragraph 10 of count one.  (*Id*. at 10-11).  Count three alleges wire fraud in violation of 18 U.S.C. §§ 1343 and 2, in connection with the wire communications detailed in paragraphs 12 through 16 of count one.  (*Id*. at 11-12).  Count four alleges money laundering in violation of 18 U.S.C. §§ 1957(a) and 2, by the transfer of $40,000 on July 16, 2018, from NEAD's bank account in which the DASNY $45,000 was deposited (as

referenced in paragraph 16 of count one) to another NEAD bank account.  (*Id.* at 13).

Count five also alleges money laundering in violation of 18 U.S.C. §§ 1957(a) and 2 by

the transfer on July 18, 2018, of $15,801.67 from the NEAD bank account that received

the funds referenced in count four, to an ADP Wage Pay account.  (*Id.*).

Moses seeks dismissal of counts one through five on the grounds that the allegations

are legally insufficient to constitute the crimes alleged therein.  (Dkt. 143-1).   The

government opposes the motion.  (Dkt. 146).  Moses submitted a reply in further support

of his motion and in response to the government's opposition.  (Dkt. 148).  Oral argument

was held before the undersigned on December 16, 2020, at which time the Court reserved

decision and took the matter under advisement.  (Dkt. 149).

## III.   DISCUSSION

### A.   The Parties' Positions

#### 1.   Moses' Initial Motion Papers

Moses contends that counts one through five are insufficient because the wire and

mail fraud counts (and the count for conspiracy to commit the same) lack the requisite

allegations of fraudulent intent, and the money laundering counts based on those counts

must also necessarily fail.  (Dkt. 143-1 at 4-5).  Moses argues that the government has

conflated intent to deceive with intent to defraud.  (*Id*. at 7).  To support his argument,

Moses focuses on paragraph 3 of count one of the indictment, which states as follows:

> The object of the conspiracy was for the defendant MOSES and Shirley
> Boone to fraudulently obtain a $45,000 grant reimbursement from DASNY
> for NEAD. To do so, the defendant MOSES and Shirley Boone falsely
> represented to DASNY that Freedom Community was hired by NEAD to
> provide roofing and other rehabilitation services at a cost of $45,000, when

in actuality, Freedom Community was not a construction company, nor did it provide roofing or other rehabilitation services for NEAD.

(*See* Dkt. 143-1 at 8; *see also* Indictment at Count One, ¶ 3).  According to Moses, "[t]he alleged deceit in this fraud scheme is that NEAD falsely represented to DASNY that NEAD *hired* [Freedom Community] to do roofing/rehabilitation for $45K, when in fact . . . [Freedom Community] was not a construction company; and . . . [Freedom Community] did not do roofing and rehabilitation *for NEAD*."  (*Id*. (emphasis in original)).  Because, Moses argues, "deceit is sufficient to establish mail and wire fraud only if it has 'relevance to the object of the contract,'" the contract between NEAD and DASNY must be examined. (*Id*. (quoting *United States v. Starr*, 816 F.2d 94, 100 (2d Cir. 1987)).  Moses refers to paragraphs 4 through 6 of count one as reciting the documents that formed the basis of the relationship between NEAD and DASNY, and attaches those documents to his counsel's affirmation in support of the motion to dismiss.[5]  (*Id*.).  Because those documents did not require or even mention that Freedom Community would do the construction work for which DASNY agreed to pay, Moses argues that the alleged misrepresentation to DASNY that Freedom Community was the contractor performing the work has no relevance to the object of the contract.  (*Id*. at 8-11).  Thus, according to Moses' logic, even assuming that Moses misrepresented that Freedom Community was doing the work for which DASNY had awarded the grant, counts one through three are insufficient and should be dismissed.

---

[5]      Moses contends that the documents amplify the indictment and may be considered by the Court in determining the motion to dismiss.  (Dkt. 143-1 at 9 (citing *United States v. Von Barta*, 635 F.2d 999, 1002 (2d Cir. 1980)).  Although at least one court has described this practice as "unusual," *United States v. Grasso*, 173 F. Supp. 2d 353, 360 n.10 (E.D. Pa. 2001) (citation omitted), the government has not objected.

(*Id.* at 11).  Moses also argues that the indictment fails to allege "that the work for which NEAD fraudulently sought $45,000 in reimbursement was not performed."  (*Id.*).

Moses goes on to anticipate a potential argument by the government under a right to control theory[6] for the mail and wire fraud counts.  (*Id.* at 12).  According to Moses, that theory cannot save the counts, because again, the documents that served as the basis for the relationship between DASNY and NEAD "clearly state that what [DASNY] bargained for, . . . was renovation of the properties at 359 and 360 Webster Avenue," and there "is no allegation in the indictment that NEAD ever contemplated that DASNY would not receive the full economic benefit of its bargain"—in other words, the renovation of 359 and 360 Webster Avenue.  (*Id.* at 14-15 (quotations omitted and first alteration in original)).

## 2.    The Government's Opposition Papers

The government disputes Moses' claim that the indictment only alleges an intent to deceive, not an intent to defraud.  According to the government, "[a] full and reasonable reading of the counts in their entirety sufficiently apprises the defendant that he is alleged to have caused a $45,000 harm to DASNY."  (Dkt. 146 at 8).  The government references paragraph 3 of count one, the same one relied upon by Moses, but contends that the paragraph sets forth both the object of the conspiracy (to fraudulently obtain a $45,000 grant reimbursement from DASNY for NEAD) and how the object of the scheme was

---

[6]    The Second Circuit has recognized that "the property interests protected by the [mail and wire fraud] statutes include the interest of a victim in controlling his or her own assets," and therefore a "cognizable harm occurs where the defendant's scheme 'den[ies] the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions.'"  *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015).

accomplished (by the use of Freedom Community to trick DASNY).  (*Id*.).  The latter is not the object of the scheme, according to the government, but rather the means or method by which it was accomplished.  (*Id*. at 10).

The government also cites to paragraph 10(a) of count one as sufficiently alleging by itself an intent to defraud, wherein it states:

> Between on or about February 28, 2018 and on or about March 5, 2018, a letter signed by the defendant MOSES, on behalf of NEAD, was sent by United States mail to DASNY along with (a) a Payment Requisition Form and Dual Certification form signed by the defendant MOSES which *falsely represented* that NEAD had paid $45,000 for work *purportedly performed* in connection with the NEAD Project. . . .

(*Id*. at 9 (emphasis added)).  The government also cites to paragraph 16 of count one which alleges:  "On or about July 16, 2018, *as a result of the scheme* and artifice, DASNY wire transferred in interstate commerce $45,000 from its bank account to NEAD's M&T Bank . . . account ending 5649, to reimburse NEAD."  (*Id*. (emphasis added)).  Thus, according to the government, "anyone reading the allegations in counts 1 through 3 would reasonably conclude that this case involves a contemplated harm, that is, that DASNY was defrauded of $45,000, and that the counts fairly inform the defendant of the charges against which he must defend."  (*Id*.).

The government also takes issue with Moses' contention that the indictment does not allege that the work for which NEAD fraudulently sought $45,000 was not performed, citing to paragraph 10(a)—which expressly alleges that NEAD "falsely represented" to DASNY that it had paid $45,000 for work "purportedly performed" in connection with the NEAD Project.  (*Id*.).

The government contends that it is irrelevant whether the agreements that formed the basis for the relationship between NEAD and DASNY in 2016 and 2017, contemplated a specific contractor being used for the NEAD Project, because counts one through three "do not allege that the scheme began during the application and Grant Agreement process, and do not allege that the scheme involved the use of the wrong contractor." (*Id*. at 10). Instead, the government contends that the indictment alleges that "the scheme began later in February 2018," when Moses "submitted the request for the $45,000 reimbursement in which he fraudulently claimed that (1) work purportedly had been performed for NEAD, and (2) NEAD had paid $45,000 for such purported work." (*Id*.).

The government further argues that Moses impermissibly relies on facts outside the indictment by "implying that there was no harm no foul from the scheme because the work had been performed by another contractor and NEAD had paid such contractor $45,000 for the work." (*Id*. at 10). The government states that it is prepared to prove at trial that at the time Moses requested reimbursement from DASNY, NEAD had not paid $45,000 to any contractor or contractors. (*Id*. at 11).

The government further argues that, while it does not have to rely on the right to control theory because counts one through three allege a contemplated harm of $45,000 to DASNY, the right to control theory is also satisfied. (*Id*. at 12-15). This is because, according to the government, the Grant Agreement "required the submission of accurate documentation to the reasonable satisfaction of DASNY so that DASNY, before releasing any grant funds, could properly determine whether NEAD had in fact paid $45,000, had $45,000 worth of work performed, and had complied with all other terms of the Grant

Agreement.  By not having accurate and truthful documentation, DASNY was unable to make an informed decision on whether to release the grant funds to NEAD." (*Id.* at 14.).

       3.    Moses' Reply Papers

Moses contends that the government misconstrues the indictment—and in fact, the object of the conspiracy was, as Moses claimed in his initial motion papers, "to defraud DASNY by falsely representing that Freedom Community had performed the work required under the contract."  (Dkt. 148 at 3).  Moses takes this construction from the second sentence of paragraph three of count one, and argues that this second sentence could not possibly reference the means or method of accomplishing the objective of the conspiracy (as claimed by the government) because it is contained in the section of count one entitled "The Object of the Conspiracy"—not in the separate section entitled "Means by which the Object of the Conspiracy was to be Accomplished."[7]  (Dkt. 148 at 5-6).  Moses further argues that while paragraph 10(a) of count one "read in a vacuum . . . *by itself* alleges a contemplated harm," that interpretation cannot be reconciled with reading the remainder of paragraph 10 or the other paragraphs contained in the "Means" section of count one, which reference "the implementation of the conspiracy objective—that NEAD fraudulently obtain $45,000 from DASNY by falsely representing that Freedom Community performed $45,000 of services."  (*Id.* at 7).

---

[7]    Count one contains three sections:  (1) "The Object of the Conspiracy" (consisting of paragraphs 2 through 3); (2) "Background" (consisting of paragraphs 4 through 8); and (3) "Means by which the Object of the Conspiracy was to be Accomplished" (consisting of paragraphs 9 through 16).  (Indictment at 6-10).  Counts two and three incorporate the allegations in count one, and counts four and five incorporate the allegations in counts one through three.  (*Id*. at 10-13).

Moses further argues in reply that the right to control theory does not save the indictment because the object of the DASNY-NEAD contract was payment by DASNY to NEAD for renovation of 359 and 360 Webster Avenue, and because the entity selected to perform the work had no relevance to the object of the contract, the "alleged misrepresentation as to what entity performed the work is insufficient to establish the requisite contemplation of injury to DASNY." (*Id.* at 9). According to Moses, failing to provide accurate information under the terms of the contract (by mispresenting that Freedom Community performed the work) does not affect the very nature of the bargain itself, and thus cannot serve as the basis for a mail or wire fraud charge. (*Id.*).

B.    Legal Standards

Federal Rule of Criminal Procedure 7(c)(1) requires, among other things, that an indictment contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged. . . ." There are two constitutional requirements for an indictment to be sufficient: (1) it must contain "the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend," and (2) it must enable the defendant "to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). "Nevertheless, 'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992)). "Generally, the indictment does not have to specify evidence or details of how the offense

was committed.  Simply put, the validity of an indictment is tested by its allegations, not by whether the Government can prove its case."  *United States v. Walters*, 963 F. Supp. 2d 125, 130 (E.D.N.Y. 2013) (citation omitted); *see also United States v. Raniere*, 384 F. Supp. 3d 282, 301 (E.D.N.Y. 2019) ("[T]here is a difference between what the Government must prove at trial and what it must plead in the indictment.").  In reviewing the facial sufficiency of an indictment, the facts alleged therein must be assumed to be true, and "[c]ontrary assertions of fact by the defendants will not be considered."  *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

"An indictment 'need not be perfect, and common sense and reason are more important than technicalities.'"  *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *United States v. De La Pava*, 268 F.3d 157, 162 (2d Cir. 2001)).  Indeed, "common sense must control, and . . . '[a]n indictment must be read to include facts which are necessarily implied by the specific allegations made.'"  *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (quoting *United States v. Silverman*, 430 F.2d 106, 111 (2d Cir. 1970), and second alteration in original).

The essential elements of both mail and wire fraud are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme."  *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (quoting *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004)).  "'To prove conspiracy, the government must show that the defendant agreed with another to commit the offense' and 'that he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy.'"  *United States v. Carpenter*, 190 F. Supp. 3d 260, 266

(D. Conn. 2016) (quoting *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008)), *aff'd sub nom. United States v. Bursey*, 801 F. App'x 1 (2d Cir. 2020).

"It is not required that the victims of the scheme in fact suffered harm, but 'the government must, at a minimum, prove that defendants contemplated some actual harm or injury to their victims.'" *Binday*, 804 F.3d at 569 (quoting *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006)). "An intent to harm a party to a transaction cannot be found where the evidence merely indicates that the services contracted for were dishonestly completed." *Novak*, 443 F.3d at 159. The Second Circuit has "drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain— which do violate the mail and wire fraud statutes." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007). Thus, an intent to deceive, without the corresponding intent to harm, is not enough. *See United State v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994). Moreover, "the harm contemplated must affect the very nature of the bargain itself." *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987). In other words, it must have "relevance to the object of the contract. . . ." *Id.* at 100.

"When the 'necessary result' of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself." *D'Amato*, 39 F.3d at 1257 (quoting *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1181 (2d Cir. 1970)); *see Starr*, 816 F.2d at 98 ("Such harm is apparent where there exists a 'discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits

which the defendant delivered, or intended to deliver.'" (quoting *Regent Office Supply*, 421 F.2d at 1182)).  However, "[w]here the scheme does not cause injury to the alleged victim as its necessary result, the government must produce evidence independent of the alleged scheme to show the defendant's fraudulent intent."  *D'Amato*, 39 F.3d at 1257.

Thus, for instance, in *Starr*, the Second Circuit reversed the mail and wire fraud convictions of owners of a bulk mailing service based on insufficiency of the evidence. The defendants had falsely represented to their customers that funds deposited with them would be used only to pay for their customers' postage fees, when in fact only a portion was used for postage fees and the rest was misappropriated by the defendants.  816 F.2d at 99.  The Second Circuit recognized that the customers were deceived, but the record showed little else:

> The [defendants] did in fact mail their customers' brochures promptly as promised and caused them to arrive at the correct destination.  The agreement for the timely shipment and handling of bulk mail was the basis of the bargain between the [defendants] and their customers.  The [defendants] in no way misrepresented to their customers the nature or quality of the service they were providing.  Indeed, satisfied customers were a necessary ingredient in the successful operation of their business.  Therefore, because [the defendants' business] customers received exactly what they paid for, there was no discrepancy between benefits 'reasonably anticipated' and actual benefits received.  An intent to defraud the lettershoppe customers was not demonstrated either directly or circumstantially.

*Id*. at 99.  As noted in the concurring opinion, the Postal Service was defrauded, but not the defendants' customers—and the government "simply indicted the defendants for defrauding the wrong party."  *Id*. at 102 (Newman, J., concurring).

In *Novak*, the Second Circuit similarly reversed a mail fraud conviction based on insufficiency of the evidence where the defendant, a union official, received kickbacks of

payments made to union members by contractors for wages based on "no-show hours." 443 F.3d at 154. The contractors knew they were paying wages for "no-show hours," but they did not know about the kickbacks. *Id*. at 153-54. The Second Circuit concluded that the government's claim that the contractors would not have paid for the no-show hours had they been aware of the kickbacks to the defendant was a "hypothetical contention" that was "inadequate to support a finding of fraudulent intent." *Id*. at 159. Because the contractors, like the customers in *Starr*, "received all they bargained for," and the defendant's "conduct did not affect an essential element of those bargains," the evidence did not establish that the defendant intended to harm the contractors, and thus was insufficient to support a mail fraud conviction. *Id*.

Likewise, in *Regent Office Supply*, the Second Circuit reversed the mail fraud convictions of the defendants because, while the defendants were in the business of selling stationery supplies through salesmen who used false representations to talk to the purchasing agent of a potential customer, there were no false representations directed "to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain. . . ." 421 F.2d at 1179. The court rejected "the government's theory that fraud may exist in a commercial transaction even when the customer gets exactly what he expected and at the price he expected to pay." *Id*. at 1180.

And in *Shellef*, the Second Circuit found an indictment insufficient where it alleged that the defendants misrepresented to manufacturers that they intended to export a purchased industrial chemical product (thus rendering the sale excise-tax-free), when in fact they intended to sell the product domestically. The Second Circuit explained that the

indictment did not allege "that there was a 'discrepancy between benefits reasonably anticipated' and actual benefits received" by the manufacturers, and it also failed "to allege that [the defendants] misrepresented 'the nature of the bargain.'" 507 F.3d at 109 (quoting *Starr*, 816 F.2d at 98, and *Regent Office Supply*, 421 F.3d at 1179). Rather, the indictment only alleged that the defendants' conduct induced the manufacturers to enter into a transaction they would otherwise have avoided, but because it did not allege that the misrepresentations had relevance to the object of the contract, it was not sufficient. *Id.* The Second Circuit drew a distinction with the holding in *United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991), which did not address the sufficiency of the indictment but rather the sufficiency of the evidence. *Shellef*, 507 F.3d at 109. In *Schwartz*, the defendants had purchased night-vision goggles representing to the manufacturer that they would not export the goggles, which was prohibited under federal law. 924 F.2d at 414. The court upheld the wire fraud convictions in *Schwartz* because the "misrepresentations went to an essential element of the bargain between the parties and were not simply fraudulent inducements to gain access to" the equipment. *Id.* at 421.

C.    Analysis

Moses' motion to dismiss must be denied  As a threshold matter, the motion is premature, because it depends on facts not alleged in and inconsistent with the indictment. Specifically, even if Moses' construction of the indictment is correct, the allegations are that $45,000 was fraudulently obtained from DASNY for work that was not performed by Freedom Community. Moses tries to read into the indictment an implication that the work was performed by another contractor, but that is nowhere alleged in the indictment. To the

contrary, the indictment alleges that the "Payment Requisition Form and Dual Certification form" Moses signed and sent to DASNY "falsely represented that NEAD had paid $45,000 for work purportedly performed in connection with the NEAD Project[.]"  (Indictment at Count One, ¶ 10).  Further, as the government argues in opposition to Moses' motion, the entire scheme alleged in counts one through five of the indictment would have been unnecessary and nonsensical if the work had been done—"[h]ad NEAD paid actual contractors for real work performed, logically [Moses] would have submitted the legitimate documentation from such contractors to obtain the $45,000 reimbursement, rather than take the unneeded risk of fraudulently claiming that Freedom Community had performed and been paid $45,000 for such work."  (Dkt. 146 at 11).  It would be error for the Court, at this point of the proceedings, to operate on the assumption that the work was actually performed by a contractor other than Freedom Community, because such an assumption is inconsistent with and contradictory to the facts alleged in the indictment.

The essential thread running through all the Second Circuit cases discussed above in which an indictment or the evidence was determined to be insufficient is that the victims received the benefit of their bargain.  However, in this case, the necessary implication of the allegations in the indictment is that DASNY did not receive the anticipated benefit of its $45,000 grant, because no construction work had actually been performed on the NEAD Project, by Freedom Community or anyone else.  There can be no question that an essential part of the contract between NEAD and DASNY was that moneys would only be paid for work that was performed.  Thus, even under Moses' reading of the indictment, it would be

premature to dismiss the allegations in counts one through five at this stage of the proceedings.

Separate and apart from that threshold issue, a fundamental step in resolving the pending motion is to determine whether the allegations concerning mail and wire fraud involving DASNY should be interpreted as claimed by Moses or as claimed by the government. At oral argument Moses conceded that his theory of dismissal depends on the indictment being read as he claims. Moses contends that the indictment alleges that the scheme to defraud had as its object the misrepresentation to DASNY that NEAD hired Freedom Community to do construction work, when in fact Freedom Community was not a construction company and did not perform this work for NEAD. (Dkt. 143-1 at 8). The government contends that the object of the scheme was to fraudulently obtain $45,000 from DASNY, and the use of Freedom Community was how the scheme was accomplished. (Dkt. 146 at 8-10).

The Court agrees with the government that the object of the scheme is exactly what the indictment says it was: "for the defendant MOSES and Shirley Boone to fraudulently obtain a $45,000 grant reimbursement from DASNY for NEAD." (Indictment at Count One, ¶ 3). Moses tries to take the next sentence of that very same paragraph, which describes *how* Moses and Boone accomplished this objective (by "falsely represent[ing] to DASNY that Freedom Community was hired by NEAD to provide roofing and other rehabilitation services at a cost of $45,000"), and construe that language as restricting the object of the scheme. This is not a reasonable interpretation of the indictment.

Moses does not base his argument on the language in paragraph 3—and he really could not, since the meaning of to "do" is to bring to pass, carry out, perform, or execute. *Do,* Merriam-Webster's Online Dictionary (accessed Jan. 12, 2020). In other words, the plain language of paragraph 3 describes the object (obtaining $45,000 from DASNY) and the means by which that object was brought to pass, carried out, performed, or executed (falsely representing that Freedom Community did the work). Nonetheless, Moses construes the second sentence of paragraph 3 as defining the object of the scheme by relying exclusively on the heading in that section of count one—which is entitled "The Object of the Conspiracy." The Court rejects the notion that a heading could change the clear-cut meaning of the words in paragraph 3. Rather, applying a common sense reading to paragraph 3, it plainly states the object of the scheme and then succinctly summarizes the means. The means are then described more specifically in the subsequent paragraphs 9 through 16.

Thus, the indictment alleges a scheme to defraud DASNY of $45,000 through the use of the mails and wires. This was accomplished by Moses signing a $45,000 check from NEAD to Freedom Community to make it "falsely appear" that Freedom Community had been paid that amount for construction services, when it performed no such services (Indictment at Count One, ¶ 9); by Moses mailing a Payment Requisition Form and Dual Certification to DASNY "*falsely represent[ing]* that NEAD had paid $45,000 for work *purportedly performed* in connection with the NEAD Project" (*id.* at ¶ 10(a) (emphasis added)); and by Moses and Shirley Boone mailing and emailing other documents to DASNY making it appear as though Freedom Community had performed construction

services and that NEAD had paid Freedom Community $45,000 for those services (*id.* at ¶¶ 10(b)-(c), 12-15). Moreover, the indictment plainly alleges the harm caused as a result of the scheme—on July 16, 2018, DASNY wire transferred $45,000 to NEAD's M&T Bank account. (*Id.* at ¶ 16).

The premise of the indictment is not that "services contracted for were dishonestly completed." *Novak*, 443 F.3d at 159. As discussed above, a fair reading of the indictment is that DASNY paid for services that were *not* completed. Paragraph 10(a) says just that— that Moses "*falsely represented*" that NEAD paid for $45,000 in construction services. It does not tie the false representation to one particular construction company performing the work as opposed to another. Rather, the alleged scheme depended on a misrepresentation of an essential element of the bargain—that NEAD had incurred costs for construction services of $45,000, for which it obtained reimbursement from DASNY through the grant.

The Court recognizes that "[t]he timing of the defendant's objection is important to the level of scrutiny employed" and that because Moses has objected to the indictment before trial, he "is entitled to a more exacting review of the indictment than one who waits until after trial to object." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000). But a "more exacting review" does not mean applying a hyper-technical construction that ignores common sense and the plain meaning of the words used. In essence, Moses asks that this Court dismiss an indictment because of the heading used in one section of one count, which he argues should take precedence over the plain and ordinary meaning of the words in the indictment. The Court is aware of no case that would support such a result, and Moses has cited to none. *Cf. United States v. Smith*, 967 F.3d 1196, 1211-12 (11th Cir. 2020) ("[T]he

title of a statute and the heading of a section cannot limit the plain meaning of the text." (quoting *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947)).

In sum, the indictment does not simply allege an intent to deceive with no corresponding intent to harm. Rather, it plainly alleges a contemplated harm of $45,000 to DASNY for work that was not performed. And this contemplated harm affects the very nature of the bargain between NEAD and DASNY. Accordingly, the indictment is sufficient.[8] Whether the evidence will ultimately establish an intent to defraud is left to be determined at trial.

## IV.   **CONCLUSION**

For the foregoing reasons, Moses's motion to dismiss counts one through five of the indictment (Dkt. 143) is denied.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:      January 12, 2021
            Rochester, New York

---

[8]      Because of the Court's conclusion that the indictment sufficiently alleges a contemplated harm, it need not and does not resolve the alternative arguments concerning a right to control theory.