UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

        v.

GEORGE MOSES,

        Defendant.

**DECISION AND ORDER**

6:19-CR-06074 EAW

---

## I. INTRODUCTION

Defendant George Moses ("Defendant" or "Moses") was convicted after a jury trial of one count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349 (count 1), three counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2 (counts 2, 20 and 22), ten counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2 (counts 3, 6, 11, 13, 16, 18, 19, 21, 23, and 25), two counts of money laundering in violation of 18 U.S.C. §§ 1957(a) and 2 (counts 4 and 5), two counts of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 (counts 10 and 24), three counts of federal program theft in violation of 18 U.S.C. § 666(a)(1)(A) (counts 12, 15, and 17), two counts of making false statements in violation of 18 U.S.C. § 1001(a)(2) (counts 26 and 27), and five counts of filing false income tax returns in violation of 26 U.S.C. § 7206(1) (counts 28, 29, 30, 31, and 32).[1]  The government seeks entry of a preliminary and final order of forfeiture for money judgments against Defendant in the amounts of $168,576.93 and $55,801.67,

---

[1] The count numbers referenced herein are not to those found in the fifth superseding indictment returned on August 27, 2020 (Dkt. 123), but to those in the redacted indictment presented to the jury (Dkt. 379).

pursuant to two forfeiture allegations. (Dkt. 394; *see* Dkt. 405 at 5). Defendant opposes the government's motion in part, arguing that any judgment entered on the government's first forfeiture allegation should not exceed $139,744.80. (Dkt. 400 at 13). For the reasons set forth below, the Court enters a preliminary order that a judgment of $157,368.21 should be entered on the government's first forfeiture allegation and that a judgment of $55,801.67 should be entered on the government's second forfeiture allegation.

## II. BACKGROUND

Familiarity with this matter, including the evidence presented at trial, is assumed for purposes of the instant Decision and Order.

The fifth superseding indictment returned on August 27, 2020, contains four forfeiture allegations. (Dkt. 123 at 74-79). The first forfeiture allegation relates to Defendant's conviction on counts 13 (wire fraud), 15 (federal program theft), 16 (wire fraud), 18 (wire fraud), 19 (wire fraud), 21 (wire fraud), 23 (wire fraud), and 24 (conspiracy to commit wire fraud).[2] (*Id*. at 74-75). The second forfeiture allegation relates to Defendant's conviction on counts 4 and 5, both of which are for money laundering. (*Id*. at 75-76). The third and fourth forfeiture allegations are not at issue and are not discussed further in this Decision and Order.

On September 29, 2021, prior to the commencement of trial, the government filed a submission indicating that it would submit a motion for a preliminary and final order of

---

[2]     Before they were renumbered in the redacted indictment, these counts were counts 19, 21, 22, 24, 25, 27, 29, and 30 of the fifth superseding indictment. (*Compare* Dkt. 123 *with* Dkt. 379).

forfeiture, if appropriate, after the jury returned its verdict. (Dkt. 256). Defendant agreed that any forfeiture issues would be decided by the Court after trial, if necessary. (Dkt. 419 at 83-84). Trial commenced on October 12, 2021 (Dkt. 278), and the jury returned its verdict on November 30, 2021. (Dkt. 376; Dkt. 380).

The government filed its motion for entry of a preliminary and final order of forfeiture on January 14, 2022. (Dkt. 394). In the motion, the government sought entry of a money judgment in the amount of $194,175.26 on the first forfeiture allegation and $55,801.67 on the second forfeiture allegation. (*Id*. at 1). Defendant filed his opposition papers on February 8, 2022. (Dkt. 400). The government filed its reply on February 22, 2022. (Dkt. 405). In its reply, the government modified the requested amount of the money judgment on the first forfeiture allegation to $168,576.93. (*Id*. at 5).

### III.   DISCUSSION

#### A.   Legal Standard

Pursuant to 21 U.S.C. § 2461(c):

> If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case pursuant to the Federal Rules of Criminal Procedure and section 3554 of title 18, United States Code.

*Id*. "Section 2461(c) thus authorizes criminal forfeiture as a punishment for any act for which civil forfeiture is authorized, and allows the government to combine criminal conviction and criminal forfeiture in a consolidated proceeding." *United States v.*

*Razmilovic*, 419 F.3d 134, 136 (2d Cir. 2005).  Civil forfeiture is authorized for wire fraud and federal program theft pursuant to 18 U.S.C. § 981(a)(1)(C).  *See also id.* § 1956(c)(7); *id*. § 1961(1); *United States v. Schlesinger*, 514 F.3d 277, 278 (2d Cir. 2008).

"Criminal forfeiture focuses on the disgorgement by a defendant of his ill-gotten gains.  Thus, the calculation of a forfeiture amount in criminal cases is usually based on the defendant's actual gain." *United States v. Contorinis*, 692 F.3d 136, 146 (2d Cir. 2012) (quotation and citations omitted).[3]  "The calculation of the amount of forfeiture is . . . within the province of the sentencing court." *United States v. Stevenson*, 834 F.3d 80, 86 (2d Cir. 2016).  "Because criminal forfeiture is viewed as part of the sentencing process, the government need prove facts supporting forfeiture only by a preponderance of the evidence." *United States v. Gaskin*, 364 F.3d 438, 461 (2d Cir. 2004) (citations omitted). "The calculation of forfeiture amounts is not an exact science.  The court need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information." *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011) (quotation and alteration omitted).  In particular, "[a] court is permitted to use general points of reference as a starting point for calculating the losses or gains from fraudulent transactions and may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding." *Id*.  The criminal forfeiture

---

[3]   A forfeiture calculation is accordingly distinct from a calculation of loss amount for purposes of the Sentencing Guidelines.  The amount-of-loss calculation is meant to "measure the seriousness of [the defendant's] criminal conduct," *United States v. Certified Env't Servs., Inc*., 753 F.3d 72, 102 (2d Cir. 2014), and thus encompasses all pecuniary harm (actual or intended) resulting from the offense.

statutes permit the Court to impose a money judgment "on a defendant who possesses no assets at the time of sentencing." *United States v. Awad*, 598 F.3d 76, 78 (2d Cir. 2010).

### B.     The First Forfeiture Allegation

As noted above, the government originally sought entry of a money judgment in the amount of $194,175.26 on the first forfeiture allegation. (Dkt. 394 at 1). The government relied on the proof at trial to support its calculation. (*See id*. at 8). In opposition, Defendant objected to the following items included by the government:

- As to count 15, $21,800 that Rochester Housing Charities ("RHC") paid to Akwesasne Construction ("Akwesasne").

- As to count 21, the following purchases that allegedly constitute personal expenses that Defendant paid using money belonging to North East Area Development Inc. ("NEAD"):

    - $1,157.71 to Field and Stream;
    - $199.23 to Pandora Internet Radio;
    - $234 to Lionism.tv;
    - $98.80 to the Liquor Control Board of Ontario;
    - $254.66 to Shoe Department Encore;
    - $37.45 to Improve Defensive Driving;
    - $11.50 to Buffalo Bills concessions;
    - $2,059.64 to Silvertrust Media;
    - $560 to Frosch International Travel and Allianz Travel Insurance;
    - $3,377.90 for reimbursement of "medical" expenses;

- o $24,440.92 in charges for Canadian travel;

- o $4,843.83 in charges for meals at Rochester-area restaurants;

- o $2,676 for tickets to a New York Knicks basketball game.

(*See* Dkt. 400 at 6-12).

As to the $21,800 payment from RHC to Akwesasne, Defendant does not argue that this payment was not shown at trial to be fraudulent. Instead, he contends that he did not personally acquire these funds, which were paid to a third-party in which he had no ownership interest. (*See id*. at 6-7). As to the alleged personal expenses related to count 21, Defendant argues that the evidence relied upon by the government is insufficient to demonstrate by a preponderance of the evidence that these expenses were not for legitimate purposes. (*See id*. at 7-12).

In reply, the government modified its request for a money judgment as to the first forfeiture allegation to seek $168,576.93. Although the government failed to explain how it reached that reduced figure, it did not include in its reply any argument as to: the $21,800 payment from RHC to Akwesasne; the $1,157.71 payment to Field and Stream; the $199.23 payment to Pandora Internet Radio; the $234 payment to Lionism.tv; the $98.80 payment to the Liquor Control Board of Canada; the $37.45 payment to Improve Defensive Driving; the $11.50 payment to Buffalo Bills concessions; and the $2,059.64 payment to Silvertrust Media. Adding these items together totals $25,598.33. Subtracting this amount from the original request of $194,175.26 yields a result of $168,576.93. The Court

accordingly concludes that the government is conceding that these items should not be included in the forfeiture amount on the first forfeiture allegation.

The Court accordingly turns to the disputed items as to which the government has argued in reply. The Court considers first the $254.66 payment to Shoe Department Encore. The government's sole argument as to this payment is that Regina Seabrook ("Seabrook"), the President of NEAD's Board of Directors, testified that this payment was to a shoe store. (*See* Dkt. 405 at 2). The Court agrees with Defendant that this is insufficient to demonstrate by a preponderance of the evidence that this payment was for Defendant's personal benefit. Accordingly, this item will not be included in the forfeiture amount.

Next, the Court considers the $560 payment to Frosch International Travel and Allianz Travel Insurance. It was established at trial that this payment related to a trip to Israel. Seabrook—whom the Court found to be a credible witness—testified at trial that she was never advised of any plan by Defendant to travel to Israel on NEAD's behalf, nor was she aware that NEAD funds had been used to make this payment. (*See* Dkt. 405-1 at 327).[4] Seabrook further testified that Defendant would report all significant events involving NEAD to the board (*id*. at 175) and that Defendant was not permitted to authorize reimbursements or the payment of per diems to himself (*id*. at 197-98). The Court finds this information sufficient to demonstrate by a preponderance of the evidence that this trip was not a legitimate NEAD-related expense.

---

[4] When referring to trial testimony, the Court has cited to the page number generated by CM/ECF and not to the transcript page number.

Turning to the $3,377.90 reimbursement for "medical" expenses, Defendant argues that Seabrook "freely and without deception approved these expenses." (Dkt. 400 at 10). However, this is not what Seabrook testified to at trial. Instead, Seabrook testified that when Shirley Boone ("Boone")—NEAD's administrative assistant/chief of staff and a co-defendant and co-conspirator of Defendant—sent her a request to approve the reimbursement, she was nervous about the amount. (Dkt. 405-1 at 200-02). Seabrook testified that she called Boone, and that Boone told her that the reimbursement was for a "medical benefit" to which Defendant was entitled. (*Id*. at 201-02). Based on that representation by Boone, Seabrook approved the use of her signature stamp on a reimbursement check. (*Id*. at 202-03). However, the underlying paperwork showed that the expenses at issue were not genuine medical expenses of Defendant's, but were instead for items such as weight loss supplements, incense oil, various food and beverages, and dental and vision care for his children. (*See id*. at 203-10). Seabrook made clear that if she had been advised of the true nature of the "medical" expenses, and not misled by Boone—whom the Court reasonably concludes was acting at Defendant's instruction in seeking the reimbursement (*see* Dkt. 305 at 110-11 (Boone testifying that she did not know what the items were, only that Defendant asked for reimbursement for them))—she would not have given her authorization.[5] (*Id*.). The Court found this testimony credible and

---

[5]   Boone did testify at trial that Defendant never instructed her to hide the underlying receipts related to this reimbursement request. (*See* Dkt. 316 at 145-52). However, this testimony does not impact the Court's analysis. The evidence at trial established that Seabrook did not ever ask to see the underlying receipts, and so there was no need for Defendant to give Boone such an instruction.

concludes that it is sufficient to support a finding that this reimbursement should be included within the forfeiture amount.

The Court next considers the charges Defendant made on NEAD's credit card for travel to Canada, which amounted to $24,440.92. Defendant contends that the government cannot show that "every trip underwritten by NEAD was personal rather than business-related." (Dkt. 400 at 10). Defendant points out that Kevin White ("White"), the former director of operations of RHC, testified regarding his efforts to establish a Freedom School in Canada. (*Id.* at 11; *see* Dkt. 348 at 27-33). Defendant also points to a group text message in which White and Defendant, among others, discussed meeting to talk about a "mission/vision for Canada." (*See* Dkt. 348 at 24-26). Defendant further cites to the following: Pastor Johnny Harris ("Harris") testified that Canada, as the terminus of the Underground Railroad, has particular significance in the Freedom School curriculum; accountant Lee Walter ("Walter") testified that Defendant frequently discussed franchising opportunities in Canada; and Boone and Seabrook testified that NEAD's Board was aware that Defendant would travel to Canada. (Dkt. 400 at 11). Defendant urges the Court to conclude that "no more than 25% of the Canadian travel expenses should be forfeited." (*Id.*).

On the other hand, and as the government points out, there is evidence in the record that Defendant lied to NEAD about the purposes of his travel, including by claiming to be traveling on a business trip to Albany (and submitting a fraudulent travel request indicating the same) while actually travelling to Canada for personal reasons. (*See* Dkt. 405 at 4-5). Moreover, while Defendant told Seabrook that he was traveling to Canada to sell the

Freedom School model, NEAD never saw the revenue that should have resulted if that was the case. (Dkt. 405-1 at 277). Seabrook also testified that she had no idea that Defendant was traveling to Canada as frequently as he was. (*Id*. at 280). The evidence at trial also demonstrated the substantial personal reasons that Defendant had to be in Canada, including that he had a girlfriend (who he also referred to as his fiancée) in Canada and was seeking to establish a home with her in that country.

Having considered all of the evidence of record, the Court finds by a preponderance of the evidence that little of Defendant's travel to Canada was for legitimate NEAD business. Initially, the Court did not find White to be a particularly credible witness. White was a personal friend of Defendant's who acknowledged that Defendant got him the job at RHC after White was fired from his previous employment despite the fact that he had no experience and was not qualified. (Dkt. 343 at 6-7, 9-10). The Court's own observations of White on the witness stand led it to conclude that he was trying to assist Defendant as much as he could. Moreover, the fact that White may have done work with respect to establishing a Freedom School in Canada does not establish that Defendant's many trips to Canada were in furtherance of that goal.

Similarly, while Defendant may have told Walter that he was interested in franchising opportunities in Canada, that does not establish that he was genuinely pursuing such opportunities. The evidence at trial also showed that Defendant pretended to be pursuing franchising opportunities in Florida when in actuality he was purchasing a timeshare for his own personal use. In other words, the Court has no reason to take Defendant's representations to Walter at face value.

White testified that he traveled to Canada with Defendant on six to eight occasions. (Dkt. 348 at 85). However, there was evidence at trial of more than 60 trips that Defendant took to Canada. (*See* Dkt. 405 at 278-88). The Court has cross-referenced the dates of these trips with the dates on which Defendant either sought a per diem check from NEAD or charged Canadian travel expenses to NEAD's credit card (*see* Dkt. 394-1 at 191-98; Dkt. 405-1 at 278-88) and finds by a preponderance of the evidence that Defendant used NEAD funds to pay for some portion of approximately 35 of these trips.

Even giving Defendant the benefit of the doubt that all of his travel with White (and the related expenses) was for legitimate NEAD business purposes,[6] that amounts to less than 15% of his total Canadian travel, and only approximately 23% of the trips for which he used NEAD funds. Further, the evidence at trial overwhelmingly supports the conclusion that Defendant performed little to no meaningful NEAD work in Canada. Instead, it is apparent to the Court that he was using the potential sale of the Freedom School model and the "franchising opportunities" he discussed with Walter as a smokescreen to allow him to use NEAD funds to visit his girlfriend in Canada. Indeed, this conclusion is supported by the evidence at trial clearly showing that Defendant's girlfriend was present on the trips with White and that Defendant also used NEAD funds to pay for immigration expenses for her and her mother. The Court accordingly concludes that it is more likely than not that *at most* 25 percent of Defendant's travel (equating to

---

[6] This is a generous assumption, inasmuch as White testified that on the occasions he went to Canada, he and Defendant stayed for longer than was necessary to conduct any business dealings and he met Defendant's Canadian girlfriend. (Dkt. 348 at 82-83).

$6,110.23 in travel expenses) was for legitimate NEAD purposes. Thus, $18,330.69 in Canadian travel charges is forfeitable.

As to the $4,843.83 in meal charges at Rochester-area restaurants, Defendant contends that "the Government's evidence lacked sufficient details to justify the conclusion that every restaurant expense was personal rather than NEAD-related." (Dkt. 400 at 11). The Court agrees with Defendant that the government has not come forward with sufficient evidence to satisfy the preponderance standard. In particular, the government relies on Seabrook's trial testimony that she was not aware of any reason to "wine and dine" to obtain grants on behalf of NEAD (Dkt. 405-1 at 132) and that she was aware of no reason why there would need to be a "business dinner" to obtain grants in Rochester (*id*. at 320-21). While the Court found that testimony credible, it notes that Seabrook also testified that she was only familiar with the grant process "to a degree" (Dkt. 328 at 127) and that she was not at all involved in the day-to-day operation of NEAD (*id*. at 143). While the Court certainly finds it plausible that these meal expenses were for Defendant's personal benefit—particularly in the context of all the evidence at trial, which showed that Defendant essentially treated the NEAD credit card as his own personal credit card, using it for his own expenses as he pleased—the Court is not persuaded that the general and somewhat vague evidence relied upon by the government is sufficient to meet its burden of proof. Accordingly, these meal charges will not be included in the forfeiture amount.

Finally, the Court considers the $2,676 charge for Knicks basketball tickets. As Defendant acknowledges, there was "conflicting testimony about whether the Knicks game was a Freedom School event or a Moses family event." (Dkt. 400 at 12). Harris testified

that he understood it to be a Freedom School outing, but he did not have any direct knowledge on this point. (Dkt. 328 at 52-53 ("Q. You assumed or understood that he would be bringing Freedom School kids? A. Yes. Q. And I think you said with George it's always like that? A. Correct. Q. And that's the basis for your assumption? A. Right.")).

As Defendant notes, Defendant's daughter testified that it was a Freedom School event, and Defendant's brother testified that Freedom School students were present at related Thanksgiving festivities at his home. (*See* Dkt. 400 at 12). However, Defendant's sister-in-law testified that she did not remember Freedom School students being at the game or at the related Thanksgiving festivities at her home. (*See id.*). Moreover, Boone testified that she had no knowledge of Freedom School students being taken to the Knicks game and that if it had been a Freedom School event, she would have been involved in scheduling the event, as well as in getting permission slips from parents. (Dkt. 314 at 84-85).

The Court did not find the testimony of Defendant's daughter and brother on this point at all credible based on its observation of their respective demeanors. On the other hand, Defendant's sister-in-law appeared to be telling the truth, and the Court does not find it plausible that she would have simply forgotten having unknown children in her home on a major holiday. Further, Boone's testimony on this point was credible and logical. The evidence at trial was that the Knicks game occurred the day after Thanksgiving. (Dkt. 314 at 84). It defies logic to conclude that a school field trip of that magnitude, at one of the busiest travel times of the year, could be arranged and executed without Boone's

involvement. The Court finds by a preponderance of the evidence that the Knicks tickets were a personal expense.

As to the remaining items sought included in the government's calculation as to the first forfeiture allegation, Defendant has not raised any challenges, and the Court has reviewed the government's proffered proof and concludes that the preponderance of the evidence standard is satisfied. Accordingly, the Court finds that a money judgment in the amount of $157,368.21—that is, the requested $168,576.93 less $254.66 for the purchase to Shoe Department Encore, $6,110.23 in Canadian travel expenses, and $4,843.83 in meal charges at Rochester-area restaurants (a total reduction of $11,208.72)—should be entered on the first forfeiture allegation.

### C. The Second Forfeiture Allegation

Defendant has not raised any objection to the government's request for a money judgment in the amount of $55,801.67 against Defendant on the second forfeiture allegation. The Court has reviewed the government's submission and agrees that the proof at trial—namely, the testimony of FBI Forensic Accountant Karen Leone—established by a preponderance of the evidence that $55,801.67 was the amount involved in the money laundering transactions of which Defendant was convicted. Accordingly, the Court will grant this aspect of the government's motion.

### IV. CONCLUSION

For all the reasons set forth above, the Court grants the government's motion for entry of a preliminary order of forfeiture to the extent that a money judgment in the amount of $157,368.21 shall be entered against Defendant on the first forfeiture allegation and a

money judgment in the amount of $55,801.67 shall be entered against Defendant on the second forfeiture allegation.

    SO ORDERED.

_____
ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:    November 9, 2022
             Rochester, New York