UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

**DECISION AND ORDER**

v.

6:19-CR-06074 EAW

GEORGE MOSES,

Defendant.

## I.   <u>INTRODUCTION</u>

Pending before the undersigned are objections filed by defendant George Moses ("Defendant") to the presentence investigation report filed in connection with his sentencing scheduled for November 18, 2022.  For the reasons set forth below, the Court overrules Defendant's objections in part and sustains the objections in part.

## II.   <u>BACKGROUND</u>

Familiarity with the procedural and factual background of this matter, including the evidence presented at trial, is assumed for purposes of this Decision and Order.  The Court will summarize some of the relevant details.

A jury found Defendant guilty on November 30, 2021, of one count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349 (count 1), three counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2 (counts 2, 20 and 22), ten counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2 (counts 3, 6, 11, 13, 16, 18, 19, 21, 23 and 25), two counts of money laundering in violation of 18 U.S.C. §§ 1957(a) and 2 (counts 4 and 5), two counts of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349

(counts 10 and 24), three counts of federal program theft in violation of 18 U.S.C. § 666(a)(1)(A) (counts 12, 15 and 17), two counts of making false statements in violation of 18 U.S.C. § 1001(a)(2) (counts 26 and 27), and five counts of filing false income tax returns in violation of 26 U.S.C. § 7206(1) (counts 28, 29, 30, 31, and 32).[1]

Defendant served in various roles relevant to the crimes for which he was convicted—Executive Director of the non-profit entity North East Area Development Inc. ("NEAD"); Chairman of the Board of the Rochester Housing Authority; and a member of the Board of the Rochester Housing Charities ("RHC"). Defendant also controlled Freedom Community Enterprise Inc. ("FCE"), a wholly owned for-profit subsidiary of NEAD, and Group 14621 Community Association, Inc. ("Group 14621"), a non-profit organization that was merged into NEAD.

Defendant was convicted of crimes related to fraudulent schemes perpetrated through his roles in the above-described entities. One of the schemes involved a grant obtained from the Dormitory Authority of the State of New York ("DASNY"), that was the subject of Counts 1 through 5. Defendant worked with Shirley Boone ("Boone"), NEAD's administrative assistant/chief of staff, who testified against Defendant at trial pursuant to a cooperation agreement with the government, to arrange for the payment by

---

[1]     Defendant was charged by way of a fifth superseding indictment returned on August 27, 2020. (Dkt. 123). However, the counts referenced herein are to those contained in the redacted indictment that was submitted to the jury. (Dkt. 379). This Decision and Order will reference that redacted indictment as the indictment.

DASNY to NEAD of $45,000 in July 2018, based on false representations that NEAD had paid that amount to FCE for purported construction services that were, in fact, not rendered.

Defendant was also involved in various schemes to defraud RHC as alleged in Counts 6, 10, 11, 12, 13, 15, 16, and 17.[2]  This included: a scheme involving Akwesasne Construction ("Akwesasne") whereby Defendant, with the use of a fraudulent invoice, caused RHC to pay Akwesasne $21,800 in January 2018, for services that Akwesasne actually performed for NEAD; a scheme involving HJJ Property ("HJJ Property")—a bogus company—whereby co-defendant Janis White ("White") prepared fraudulent invoices from HJJ Property addressed to RHC, and Defendant and White caused RHC to pay HJJ Property, sometimes for services that were actually provided by legitimate contractors at reduced amounts (with the HJJ Property invoices reflecting inflated amounts); a scheme that caused RHC to make payments toward Defendant's personal credit cards; a scheme whereby Defendant caused RHC to fraudulently pay FCE for various items and services, including the purchase of vehicles and the providing of snow removal and lawn care services; and a scheme whereby Defendant caused RHC to overpay its Executive Director, Ryan Van Alstyne ("Van Alstyne"), who was a close associate of Defendant's, and a portion of the overpayments were then paid directly to Defendant.

Defendant also was involved in fraudulent schemes involving NEAD, FCE, and Group 14621, as alleged in Count 18 (involving Defendant's purchase of a time share in

---

[2]     Defendant was also charged in Count 14 with a scheme to defraud RHC involving the ordering of four laptops, but the jury acquitted Defendant of this count.

Florida that was misrepresented to be the purchase of a pizza restaurant), Counts 19 and 20 (involving Defendant's purchase of a Carnival Cruise vacation), Counts 21 and 22 (involving Defendant's use of NEAD funds for his personal use), and Count 23 (involving Defendant's use of Group 14621 funds for his own personal use).

In addition, Defendant was involved in a scheme with Adam McFadden ("McFadden")—who testified against Defendant at trial pursuant to a cooperation agreement with the government—whereby Quad A for Kids and the Rochester Area Community Foundation were defrauded and caused to make payments to NEAD, which then paid some of those sums to Caesar Development LLC, a company owned by McFadden, as alleged in Counts 24 and 25.

In addition to the fraudulent schemes, Defendant was charged and convicted of making false statements to the Federal Bureau of Investigation ("FBI") as alleged in Counts 26 and 27, and filing false tax returns as alleged in Counts 28 through 32.

A presentence investigation report was initially prepared and filed on February 23, 2022.  (Dkt. 406).  Defendant filed a motion for a non-guideline sentence with supporting attorney declaration and exhibits and objections to the presentence investigation report on March 21, 2022 (Dkt. 411; Dkt. 412), the government filed a response to the objections on April 15, 2022 (Dkt. 415), and Defendant filed a reply on April 26, 2022 (Dkt. 420).  A revised presentence investigation report was then filed on April 27, 2022 (Dkt. 421), and oral argument was held before the undersigned on May 6, 2022 (Dkt. 426; Dkt. 427). Defendant filed a letter in further support of his arguments on May 20, 2022 (Dkt. 429),

and the oral argument before the undersigned was continued on May 24, 2022 (Dkt. 431), at which time the matter was taken under advisement.

A status conference was held on June 24, 2022, at which time a new sentencing date was scheduled along with the deadlines for the filing of a revised presentence investigation report (based on the Court's anticipated rulings with respect to the objections) and further sentencing submissions from the parties.  (Dkt. 436; Dkt. 438).  On August 9, 2022, the undersigned emailed the parties to advise as to how it intended to resolve Defendant's objections to the presentence investigation report with the exception of the objection to the obstruction of justice enhancement on which the Court continued to reserve decision.  (Dkt. 442).  The undersigned indicated that a written decision explaining the Court's reasoning would be issued at or before Defendant's sentencing date, which would also further resolve the applicability of the obstruction of justice enhancement.  (*Id*.).

Consistent with the Court's email resolving the objections, a second revised presentence investigation report was filed on August 29, 2022 (Dkt. 443), and then a third revised report was filed on November 9, 2022 (Dkt. 448).  For purposes of this Decision and Order, which constitutes the Court's written decision resolving Defendant's objections to the presentence investigation report (Dkt. 412), the Court will rely on the third revised report filed on November 9, 2022 (Dkt. 448) ("the PSR"), unless reference to an earlier presentence investigation report is appropriate.

III.   **DISCUSSION**

A.     **Legal Standard**

Pursuant to Federal Rule of Criminal Procedure 32, the Court must, prior to sentencing, "for any disputed portion of the presentence report or other controverted matter . . . rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B).  The Court is not required to "perform a line-by-line review of the PSR," so long as it "resolve[s] the substantive challenges" thereto.  *United States v. Reiss*, 186 F.3d 149, 156-57 (2d Cir. 1999).

"At sentencing, disputed factual allegations must be proven by the government by a preponderance of the evidence. . . ."  *United States v. Rizzo*, 349 F.3d 94, 98 (2d Cir. 2003).  However, sentencing proceedings are not "second trials," *United States v. Fatico*, 603 F.2d 1053, 1057 (2d Cir. 1979), and the sentencing court may use hearsay statements in determining the sentence, *United States v. Lee*, 818 F.2d 1052, 1055 (2d Cir. 1987); *see United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989) ("The sentencing court's discretion is 'largely unlimited either as to the kind of information [s]he may consider, or the source from which it may come.'  Any information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination." (citation omitted) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972))).

### B.      U.S.S.G. § 2B1.1—LOSS AMOUNT

The PSR concludes that the loss amount involved with Defendant's crimes was $374,211.62.  (Dkt. 448 at ¶ 331).  Defendant argues that the amount is overstated in two respects—at least $32,630.46 of the loss was not proven by a preponderance of the evidence, and the figure must be reduced "to the extent the defendant's offense conduct conferred value on a victim."  (Dkt. 412 at 11).

With respect to Defendant's argument that at least $32,630.46 was not proven by a preponderance of the evidence, for the reasons set forth in the Court's Amended Decision and Order entered November 15, 2022, concerning forfeiture, the Court concludes that $24,944.59 of the disputed items were proven by a preponderance of the evidence—namely the $560 payment to Frosch International Travel; the $3,377.90 reimbursement for "medical" expenses; $18,330.69 in Canadian travel charges (reflecting 75% of the travel expenses); and $2,676 for the Knicks tickets.  (Dkt. 450 at 7-14).  Therefore, those amounts should be included in the loss figure.  However, $15,007.06 of the disputed items were not proven by a preponderance of the evidence—and indeed, the government did not contest Defendant's arguments with respect to many of those expenditures.  (*See* Dkt. 450 at 5-14).[3]   Accordingly, $15,007.06 will be deducted from the total loss figure—and

---

[3]       In his opposition to forfeiture, Defendant argued that $39,951.65 in alleged personal expenses used with NEAD moneys could not be proven by a preponderance of the evidence.  (Dkt. 400 at 8-13).  However, Defendant also proposed that 25% of the Canadian travel expenses be forfeited (*i.e.*, $6,110.23), and "if the Court considers forfeiting a portion of the restaurant charges," then only 25% of those charges should be forfeited (*i.e.*, $1,210.96).  (*Id.* at 10-12).  Defendant's figure of $32,630.46 appears to be calculated by deducting from $39,951.65 the amounts equaling 25% of the Canadian travel and 25% of

specifically, from the $86,817.22 loss amount calculated for Counts 21 and 22.  (*See* Dkt. 448 at ¶¶ 303, 304, 331).  This adjustment reduces the total loss amount to $359,204.56.

With respect to the argument concerning the value conferred on the victim, Defendant contends that his "offense conferred significant value ($97,994) on NEAD and FCE."  (Dkt. 412 at 11).  Defendant relies on the credits against loss rule in application note 3(E)(i) to U.S.S.G. § 2B1.1 which states that loss shall be reduced by:

> The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

Defendant contends that because some of his fraudulent schemes benefitted NEAD and FCE, the total loss amount must be reduced by those benefits.  For instance, according to Defendant, the fraud that is the subject of Counts 1 through 3 may have resulted in a loss to DASNY of $45,000, but it resulted in a benefit to NEAD of $45,000.  (Dkt. 412 at 30). Likewise, according to Defendant, the fraud involving HJJ Property that is the subject of Counts 10 through 12—resulting in a total loss to RHC of $58,499.52 (*see* Dkt. 448 at ¶¶ 265-272)—involved a benefit to NEAD of $4,340 (Dkt. 412 at 30).[4]     Therefore,

---

the restaurant charges.  The Court did not accept Defendant's percentage allocations with respect to either the Canadian travel or the restaurant charges, and therefore it has used its own figures from the forfeiture determination to adjust the loss figure.

[4]      Defendant's theory is based on the fact that Grant Heating and Cooling provided a legitimate estimate to NEAD to provide services for NEAD in the amount of $4,340.  (*See* Dkt. 448 at ¶¶ 131-135).  Defendant then emailed the estimate to White, who prepared a fraudulent and almost identical HJJ Property invoice to provide fake services for RHC in

according to Defendant's logic, while some of Defendant's fraudulent schemes resulted in a loss to NEAD (*see*, *e.g.*, *id*. at ¶ 331 (reflecting loss to NEAD totaling $115,469.10 for Counts 18 through 23)), that figure must be offset by the benefit received by NEAD as a result of Defendant's other fraudulent schemes involving other victims.  Specifically, Defendant argues that the NEAD loss must be offset by $97,994.  (*See* Dkt. 412 at 30).

In response, the government contends that Defendant has mischaracterized the victims of his fraudulent schemes—in other words, NEAD and FCE were the beneficiaries of the schemes involving DASNY and the RHC, and therefore, even though they were the victims of other fraudulent schemes executed by Defendant, the total loss amount should not be offset by the value conferred on the beneficiaries of fraudulent schemes—even though they happened to be victims of other schemes perpetrated by Defendant.  (Dkt. 415 at 4).

Defendant responds by relying upon the grouping rules set forth at U.S.S.G. § 3D1.2(d) which groups counts together when they involve substantially the same harm, including instances "[w]hen the offense level is determined largely on the basis of the total amount of harm or loss . . . or some other measure of aggregate harm. . . ."  Because "counts that are grouped together are treated as constituting a single offense for purposes of the guidelines," U.S.S.G., Ch. 3, Pt. D, Intro. Comment, according to Defendant the fraud

---

the amount of $7,200.  (*See id*. at ¶ 270).  Thus, according to Defendant's reasoning, even though RHC was defrauded of $7,200, since NEAD received a benefit of $4,340, the loss amount must be reduced by that figure.

offenses must be treated as a single offense for purposes of calculating loss.  (Dkt. 420 at 16).

As an initial matter, even if Defendant was correct in his interpretation of how the loss amount should be offset, this would not impact the offense level.  Subtracting the alleged offset of $97,994 from the adjusted total loss figure of $359,204.56 results in a total loss amount of $261,210.56—a figure above the $250,000 threshold of U.S.S.G. § 2B1.1(b)(1)(G) and thus still requiring a 12-level increase in the offense level.

Moreover, the Court does not agree with Defendant's interpretation of the credits against loss rule.[5]  As the Third Circuit has explained: "The use of the word 'returned' [in the credits against loss rule] signifies that for a credit to apply, the defendant must have either *returned* the very same money or property, or have provided services that were applied to the very same money, value or property that was lost or taken during the fraud." *United States v. Fumo*, 665 F.3d 288, 312-13 (3d Cir. 2011).  In *Fumo*, the court found it was an abuse of discretion for the district court to credit the fair market value of real property against losses incurred by the defendant (a high-profile state senator) who caused a non-profit organization to purchase and lavishly furnish the property which the defendant then used as his senate office with little payment for rent or maintenance.  The court reasoned:

> [The defendant] essentially seeks to set the value of an independent 'good'
> he purportedly secured for [the non-profit organization] against the costs his

---

[5]    The United States Probation Office has represented it has conferred with representatives of the Sentencing Commission, who confirmed that Defendant's interpretation of the credits against loss rule is incorrect.  (Dkt. 448 at 88).

> frauds inflicted on it.  He offers no cases in support of this theory of loss
> calculation, which is unsurprising, as it would allow, for instance, an officer
> of a corporation which embezzled from his employer to claim credits against
> the loss caused by the embezzlement for overall increases in the company's
> assets under his watch.

*Id.* at 313.  *See also United States v. Radtke*, 415 F.3d 826, 842 (8th Cir. 2005) (rejecting

argument that defendant was entitled to credit against loss where, as opposed to returning

"the very money or property taken as part of the fraud," the defendant sought "credit for

*other* benefits provided to" victims).

Defendant has provided no authority to support his claim that treating the fraud

counts as a single offense for purpose of the grouping rules translates to treating the victims

as one for purposes of the credits against loss rule, so that the total loss amount is reduced

by money stolen from one victim that benefits another.  Moreover, Defendant's attempts

to distinguish *Fumo* and *Radtke* fall short.  The money Defendant obtained from victims

other than NEAD through some of his other schemes was not "money returned" to NEAD

or "the fair market value of the property returned" or "the services rendered" to NEAD so

as to reduce the total loss figure under the credits against loss rule.

Accordingly, while the Court has adjusted the total loss figure to $359,204.56, it

overrules Defendant's objections to the 12-level increase in the offense level pursuant to

U.S.S.G. 2B1.1(b)(1)(G).

### C.   U.S.S.G.   §   2B1.1(b)(9)(A)—Misrepresentation   re:   Charitable Organization

The   presentence   investigation   report   initially   concluded   that   Defendant misrepresented that he was acting on behalf of a charitable organization and therefore the two-level increase in the offense level set forth at U.S.S.G. § 2B1.1(b)(9)(A) applied.  This determination was based on the fact that Defendant "acting on behalf of NEAD and other entities, obtained DASNY grants to pay salaries, bought a time share with charity funds, etc." (Dkt. 421 at ¶ 400).  In support of this enhancement, the government similarly relied on the $45,000 grant from DASNY on July 16, 2018, and the use of "more than $15,000 of the grant money for NEAD's payroll, which directly benefitted the defendant and various family members on NEAD's payroll."  (Dkt. 415 at 5-6).  The government further argued that Defendant used NEAD moneys for personal expenses, including extensive travel to Canada, thus supporting a conclusion that the DASNY grant moneys were used for Defendant's personal use.  (*Id*. at 6).

U.S.S.G. § 2B1.1(b)(9)(A) provides for a 2-level increase in the offense level if the offense involved "a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency." Application Note 8 states, in relevant part, with respect to this enhancement:

> Subsection (b)(9)(A) applies in any case in which the defendant represented that the defendant was acting to obtain a benefit on behalf of a charitable[,] educational, religious, or political organization, or a government agency (regardless of whether the defendant actually was associated with the organization or government agency) *when, in fact, the defendant intended to divert all or part of that benefit (e.g., for the defendant's personal gain)*. Subsection (b)(9)(A) applies, for example, to the following:

(i) A defendant who solicited contributions for a non-existent famine relief organization.
(ii) A defendant who solicited donations from church members by falsely claiming to be a fundraiser for a religiously affiliated school.
(iii) A defendant, chief of a local fire department, who conducted a public fundraiser representing that the purpose of the fundraiser was to procure sufficient funds for a new fire engine when, in fact, the defendant intended to divert some of the funds for the defendant's personal benefit.

U.S.S.G. § 2B1.1, Application Note 8(B) (emphasis added).

The evidence plainly demonstrated that some of the DASNY moneys were used almost immediately for the unauthorized purpose of NEAD's payroll, which included payments to Defendant and his family. However, the Court is not persuaded that this implicates the enhancement under U.S.S.G. § 2B1.1(b)(9)(A). In that regard, the Court relies on the reasoning in *United States v. Nitzkin*, 37 F.4th 1290 (7th Cir. 2022), which suggests that the enhancement is intended to "people who plan to receive *secret* benefits" as opposed to an employee of a charity who is raising money for the organization that ultimately benefits that individual by paying his salary. *Id*. at 1293. *Cf. United States v. Kinney*, 211 F.3d 13, 20 (2d Cir. 2000) (prior to Amendment 617 in 2001, which promulgated Application Note 8(B), Second Circuit found unpersuasive the Tenth Circuit's decision in *United States v. Frazier*, 53 F.3d 1105 (10th Cir. 1995), finding that enhancement did not apply where defendant misused federal grant funds to purchase computers rather than provide computer training).

With respect to the use of NEAD moneys for Defendant's personal use, such as travel to Canada, the Court agrees that this could justify application of the enhancement. However, the government has not met its burden to establish that the DASNY grant moneys

were used in that manner or otherwise funneled into Defendant's pocket for his personal use.  In other words, the record plainly establishes that the DASNY moneys were obtained by fraudulent misrepresentations, but the government has not established that the same moneys were used for non-NEAD-related operations.

Accordingly, the Court sustains Defendant's objection to the two-level increase in the offense level set forth at U.S.S.G. § 2B1.1(b)(9)(A).

### D.     U.S.S.G. § 2B1.1(b)(10)(C)—Use of Sophisticated Means

The PSR applies a two-level increase in the offense level pursuant to U.S.S.G. § 2B1.1(b)(10)(C) (Dkt. 448 at ¶ 400), which applies where "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C).  Application Note 9(B) defines "sophisticated means" as follows:

> especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1 Application Note 9(B).

Here, the PSR concludes that this two-level enhancement is appropriate because of the use of fictitious entities and concealing of transactions.  (Dkt. 448 at ¶ 400).  The Addendum to the PSR elaborates that the following facts support application of this enhancement:

- 14 -

(1)     Fraudulent invoices were created to induce DASNY to provide a $45,000 grant to NEAD, and then once the money was received, it was moved to a different bank account and used, in part, to cover NEAD's payroll expenses (as opposed to the construction services that were represented);

(2)     HJJ Property was a bogus company that used fictitious invoices to facilitate the payment of moneys by RHC—with those fictitious invoices based off legitimate invoices from third party contractors, but reflecting inflated amounts;

(3)     The preparation of a fraudulent invoice causing RHC to pay Akwesasne $21,800 for services that were actually performed for NEAD;

(4)     Causing $500 in additional wages to be paid by RHC to Van Alstyne, and then diverting $380 of that additional sum to be paid directly by the payroll company to Defendant; and,

(5)     Discussing with Adam McFadden the layering of transactions.

(*Id*. at 90-91).

Defendant objects to this enhancement, arguing that the offenses that he committed were not more complex or intricate than the offenses committed by Boone, McFadden, or White, and yet the sophisticated means enhancement was not applied to any of their offense levels.  (Dkt. 412 at 13; 37-39).  Defendant contends that he "simply spent money he had the power to spend, but did so for an improper purpose."  (*Id*. at 38).  In response, the government cites to Defendant's use of the fictitious entity HJJ Property and his hiding of the purchase of the timeshare in Florida for his personal use by having the transactions listed on FCE's financial documents as a down payment for a pizza restaurant.  (Dkt. 415 at 7).

As an initial matter, with respect to Defendant's objection rooted in the failure to apply the sophisticated means enhancement to Boone, White, or McFadden, it must be

recognized that each of those defendants was sentenced pursuant to a negotiated plea agreement with the government, which did not include an agreement to apply the two-level increase pursuant to U.S.S.G. § 2B1.1(b)(10)(C).  While those plea agreements did not bind the Court, the government did not advocate for the sophisticated means enhancement for those defendants.  It is certainly plausible that the enhancement could have applied to one or more of those defendants, but the applicability of the sophisticated means enhancement was never raised with respect to those defendants' sentencings (and at least Boone and McFadden had been sentenced long before the issue was even raised in connection with Defendant's sentencing).  *See United States v. Rios*, 893 F.2d 479, 481 (2d Cir. 1990) ("As a final matter, appellant points to the lower guideline range accorded his co-defendant who was sentenced pursuant to a plea bargain on the same indictment.  The guideline level granted a co-defendant in entirely different circumstances is irrelevant in determining appellant's guideline level.").

More importantly, there is a striking difference between the conduct engaged in by Defendant when compared to Boone, White, and McFadden due to the complex nature of Defendant's fraud that reached across many different entities.  *See United States v. Fofanah*, 765 F.3d 141, 146 (2d Cir. 2014) ("The repetitive and coordinated nature of [the defendant's] conduct further reveal the sophistication of the means he employed."); *see also United States v. Bailey*, 820 F. App'x 57, 62 (2d Cir. 2020) ("Each step in a scheme need not be elaborate if 'the total scheme was sophisticated in the way all the steps were linked together.'" (quoting *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003)).

Defendant strategically placed family members and close associates into the various entities which he operated or controlled, and then was able to perpetuate and conceal his fraud by repeatedly using bogus invoices and fabricating financial records. *Fofanah*, 765 F.3d at 146 ("We have recognized that the creation and use of false documents, and other tactics to conceal offense conduct, are indicia of the sophistication of an offense."). Defendant's fraud reflected careful planning, it continued for many years, and it permeated all entities that he touched. Defendant's success was achieved, in part, by his ability to conceal in a shell-game-like manner the fraudulent transactions through the use of many different entities, including RHC, NEAD, and FCE. Defendant's fraud also employed a fictitious entity (HJJ Property), and repeatedly involved misrepresentations that expenditures were being made to advance legitimate interests of the entities that Defendant controlled when, in fact, the moneys were used to fund Defendant's lifestyle and personal expenses. This was by no means a garden variety fraud.

Just by way of example, Defendant was able to accomplish the DASNY fraud by misrepresenting that FCE performed construction services for NEAD. On February 23, 2018, he arranged for NEAD to issue a $45,000 check to FCE, which corresponded to a fabricated invoice in that amount from FCE to NEAD. On that same date, a request for the grant moneys was mailed to DASNY. DASNY personnel subsequently sought confirmation that the NEAD check had been negotiated, which was provided by submitting NEAD's bank statement. DASNY personnel also sought confirmation of the proposal for the FCE work, which Boone and Defendant fabricated and submitted, and Defendant

- 17 -

further responded to written questions from DASNY with false information. Ultimately, DASNY made a wire transfer to NEAD on July 16, 2018, of $45,000. Defendant was able to accomplish this fraud, in part, because of his control over both NEAD and FCE. Defendant fabricated the story that FCE had provided construction services for NEAD, and Defendant concealed the fact that NEAD's $45,000 payment to FCE on February 23, 2018, was just a ruse, because approximately two weeks later—on March 6, 2018—FCE issued a check in the same amount to NEAD.

This is just one of numerous instances of Defendant's manipulation of the various entities that he controlled to create fake documents and invoices, and conceal the fraudulent nature of the transactions. When considering the totality of Defendant's conduct over the course of many years—involving a fraudulent scheme to defraud DASNY, a fraudulent scheme to defraud Quad A for Kids and the Rochester Area Community Foundation, and the many different schemes to defraud RHC and NEAD/FCE/Group 14621—the Court comfortably concludes that the sophisticated means enhancement applies.

### E.    U.S.S.G. § 3B1.1—Aggravating Role in the Offense

The PSR concludes that the offense level should be increased by four pursuant to U.S.S.G. § 3B1.1(a) because Defendant was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." (Dkt. 448 at ¶ 404). Defendant does not contest that he qualifies as a leader or organizer, nor does he dispute that the criminal activity involved four participants (Defendant, Boone, McFadden, and White). (Dkt. 412 at 34). However, Defendant objects to the four-level enhancement

because no additional participants were involved in the criminal activity and it is not otherwise extensive.  (*Id*. at 34-35).

U.S.S.G. § 3B1.1, Application note 1 defines a "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted."  An example provided of one who is not criminally responsible for the commission of the offense is an "undercover law enforcement officer."

The Court concludes that the preponderance of the evidence supports the conclusion that Defendant's sister,[6] Margaret Moses, was a participant in the criminal activity.  Ms. Moses served as the bookkeeper for NEAD for four years starting in approximately March 2016. (Dkt. 327 at 14, 67).[7]  In this role, Ms. Moses was exposed to the significant personal expenses that Defendant funded with NEAD's money, and yet she attempted to disclaim any responsibility for her brother's criminal activity by perfunctorily repeating during her testimony that she was not familiar with the rules and regulations of non-profit entities. (Dkt. 323 at 208; Dkt. 327 at 18).  The Court did not find Ms. Moses' testimony in this regard credible.  Moreover, Ms. Moses admitted during her testimony to fabricating an invoice on March 28, 2018, that purported to be an invoice from a company in Canada named GMB Auto Repairs, in the amount of $3,500 for repairs purportedly done to a 2009 Chevrolet Suburban vehicle.  (Dkt. 323 at 221-229).  With Defendant's approval, Ms.

---

[6]     The PSR refers to Margaret Moses as Defendant's stepsister.  (Dkt. 448 at ¶ 454).

[7]     When referencing any transcript in this Decision and Order, the Court will refer to the automated pages generated by CM/ECF as opposed to the transcript pagination.

Moses prepared the fake invoice, and then also prepared a check request so that Defendant could be reimbursed by NEAD. (*Id.* at 227-28). This $3,500 payment was part of the wire and mail fraud allegations in Counts 21 and 22. (*See* Dkt. 379, Count 21, ¶ 23). In fact, Defendant had caused RHC to pay FCE $16,654 for the 2009 Chevrolet Suburban on January 12, 2018, so that at the time of the $3,500 NEAD payment to Defendant facilitated by Ms. Moses, NEAD did not even own the vehicle. (*See* Dkt. 448 at ¶¶ 280-281).

Ms. Moses' admitted role in the creation of this fabricated invoice, along with her tenure as NEAD's bookkeeper, supports a finding that she is criminally responsible for the offense even though she was neither prosecuted nor convicted. Specifically, the Court concludes that the credible evidence in the trial record—including the Court's assessment of Ms. Moses' credibility—supports a finding that she knowingly and willfully aided and abetted Defendant with the fraudulent scheme to defraud NEAD of moneys that were used for Defendant's personal benefit.

The Court also concludes that the evidence demonstrates that it is more likely than not that Van Alstyne was a participant in the criminal conduct. Although he was not called as a witness at trial, the evidence established that Van Alstyne was a close associate of Defendant's, he was put into the position of Executive Director of RHC by Defendant, he took orders from Defendant in that role, and he executed various documents that allowed Defendant to perpetuate his fraudulent schemes, with the preponderance of the evidence supporting a conclusion that Van Alstyne knew that RHC funds were being used for non-legitimate purposes, and Van Alstyne was directly involved in the scheme that was the

subject of Count 16 involving the overpayments of his salary from RHC which was then funnelled to Defendant.

Because the Court concludes that the threshold five participants has been established by a preponderance of the evidence, it does not reach the alternative issue of whether the criminal activity was otherwise extensive to justify application of the four-level enhancement under U.S.S.G. § 3B1.1.

### F.    U.S.S.G. § 3C1.1—OBSTRUCTION OF JUSTICE ENHANCEMENT

The PSR provides for a two-level enhancement pursuant to U.S.S.G. § 3C1.1 (*see* Dkt. 448 at ¶¶ 333, 405), which provides as follows:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

The basis for the PSR's enhancement is the conclusion that Defendant "submitted false documents at trial which purportedly authorized him to buy the timeshare and showed that he was entitled to NEAD money that he took for personal use. . . ." (*Id*. at ¶ 405).[8]  The

---

[8]      The addendum to the PSR suggests that the obstruction of justice enhancement also applies because Defendant's daughter (Thandi Moses) and brother (Arthur Smith) were called as defense witnesses at trial and falsely testified that Freedom School students attended Thanksgiving dinner in 2015 at the Smiths' house and the Knicks basketball game in New York City the following day.  (Dkt. 448 at 89).  The government also relied on this testimony in opposing Defendant's objection to the obstruction of justice enhancement.  (Dkt. 415 at 9).  For reasons previously articulated, the Court agrees with the government that the testimony of Defendant's daughter and brother was not credible.  (*See* Dkt. 450 at 13-14).  However, while it is certainly plausible that Defendant arranged for his daughter and brother to provide false testimony at trial in an effort to assist with his defense, the

PSR notes that several documents were produced by Defendant that were not admitted into evidence at trial due to a lack of sufficient authentication, including an employment contract dated April 10, 2010, a corporate resolution allegedly related to that contract dated September 20, 2011,[9] and minutes of an FCE board meeting from April 15, 2014, purportedly authorizing Defendant to purchase the timeshare in Florida.  (*Id*. at ¶ 333; *see* Dkt. 251 (pretrial letter concerning authenticity dispute regarding the documents and attaching the subject documents)).

Defendant objects to this enhancement on the ground that the government cannot prove by a preponderance of the evidence that the documents at issue were fake.  (Dkt. 412 at 10).  Defendant suggests that the government's reliance on NEAD's failure to produce the documents in response to a government subpoena is misplaced because, in the first instance, the government cannot say definitively what was produced by NEAD because law enforcement agents only copied a portion of the production, and second, the subject documents would not have fallen within the scope of the subpoena.  (*Id*. at 21-22).  In support of this argument, Defendant submits a declaration from Carl Steinbrenner, the

---

Court cannot conclude that this has been demonstrated by a preponderance of the evidence—primarily because as the government concedes, it has no evidence concerning any communications by Defendant with his daughter or brother to secure their testimony. (Dkt. 427 at 39-40).  *See United States v. Thompson*, 537 F. Supp. 3d 439, 455 (W.D.N.Y. 2021).  Thus, the Court will not apply an obstruction of enhancement based on this testimony.

[9]      In its written filings and at oral argument, the government has advanced no argument about the corporate resolution, and therefore the Court concludes that the government has not met its burden to establish an obstruction of justice enhancement based on the production of the alleged resolution.

attorney who coordinated the subpoena response on behalf of NEAD.  (*See* Dkt. 411-1 at 5-14).

In response, the government argues that the purported employment contract from 2010 with NEAD was a "false document" because it implausibly contained a provision allowing Defendant a bonus in addition to his salary of 2.25% of new revenue sources and/or an increase in revenue streams.  (Dkt. 415 at 10).  Defendant responds that this claim of implausibility is not sufficient to meet the government's burden of proof.  (Dkt. 420 at 7).  At oral argument, the government also relied on the failure of NEAD to produce the contract in response to the subpoena.  (Dkt. 427 at 40-41).

The Court concludes that the government has not met its burden with respect to the alleged employment contract.  While the Court agrees that the terms of the contract and its production by Defendant are highly suspicious, and it further agrees that the contract—if, in fact, it existed—would have been within the scope of the subpoena served on NEAD because it was allegedly extended into 2015,[10] the Court cannot conclude based on those facts that the government has established by a preponderance of the evidence that Defendant's production of this document and attempt to admit it into evidence constituted obstruction of justice.  For reasons previously articulated, Defendant failed to meet his burden as the proponent of the evidence to establish its authenticity pursuant to Federal

---

[10]    The Court is satisfied that the record establishes that the purported employment contract was not produced by NEAD in response to the government subpoena.  While the law enforcement agents may not have copied the entirety of NEAD's production, the record establishes that they reviewed the documents produced and identified relevant documents for production, which did not include the purported employment contract.

Rule of Evidence 901.  (*See* Dkt. 372 at 15-18).  The Court ultimately concluded in its "broad discretion," *United States v. Tropeano*, 252 F.3d 653, 661 (2d Cir. 2001), that the evidence presented by Defendant at trial was insufficient "to support a finding that" the document was what Defendant claimed, Fed. R. Evid. 901(a).  However, as the Court also indicated at the time, that was not to say that Defendant could not have met that burden if, for instance, he had called a witness such as his attorney's former paralegal Jace Lee, to establish a link between the document and the NEAD offices.  (*Id*. at 18).  Defendant's failure to establish the authenticity of the document for admissibility at trial does not automatically translate to the government meeting the preponderance standard to establish obstruction of justice based on Defendant's production of the document and attempt to admit it into evidence.  These are two different standards, and the government has not met its burden with respect to the obstruction enhancement by coming forward with additional evidence to demonstrate that Defendant's failure to properly authenticate this document was because it was fraudulent.

The government also relies in support of the obstruction of justice enhancement on the alleged FCE board minutes from April 2014 purportedly authorizing the purchase of the timeshare, which Defendant provided to the government just prior to the trial but never attempted to introduce into evidence.  (Dkt. 415 at 10-11; Dkt. 427 at 41-42).  Defendant has offered proof that these minutes were created on or about April 21, 2014.  (*See* Dkt. 260; Dkt. 412 at 22-23).  The Court agrees with the government that the record establishes that it is more likely than not that no FCE board ever existed, and thus the creation of these

minutes was more likely than not orchestrated by Defendant to perpetuate the fraudulent nature of his scheme to acquire the Florida timeshare for his own personal use.  However, the Court is not persuaded that U.S.S.G. § 3C1.1 is intended to apply to the production by a defendant through the discovery process of a document created as part of the fraudulent scheme.  *See United States v. Thorson*, 633 F.3d 312, 320-21 (4th Cir. 2011) ("[I]f a document had been falsified as part of the offense of conviction but before any investigation, the defendant's production of the falsified document in response to a subpoena would not support this enhancement, unless it were shown that the falsification was 'purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction.'") (quoting U.S.S.G. § 3C1.1 cmt. 1).  Again, the government bears the burden of proof, and it has failed to establish that Defendant created these minutes in April 2014 as part of some effort to thwart the investigation or prosecution of the instant offense, as opposed to conduct intended to further the underlying offense—in other words, the fraudulent scheme.  The government has cited no authority for the proposition that a subsequent production as part of reciprocal discovery of documents generated as part of the fraudulent scheme, supports the obstruction of justice enhancement, and as noted, the Fourth Circuit's decision in *Thorson* supports the opposite conclusion.

Accordingly, for the reasons set forth above, the Court sustains Defendant's objections to the 2-level enhancement under U.S.S.G. § 3C1.1.

G.    OTHER OBJECTIONS

Defendant asserts other objections to the PSR (*see* Dkt. 412 at 41-51), none of which impact the ultimate Sentencing Guideline calculation nor will the issues raised impact sentencing.  For instance, Defendant objects to the PSR's summary of the trial testimony as incomplete and "at times one-sided."  (*Id*. at 50-51).  However, the Court presided over the trial and will rely on its own knowledge of the trial testimony in imposing any sentence, as opposed to the summary set forth in the PSR.  Similarly, Defendant objects to the reference to his Canadian girlfriend as his fiancée.  (*Id*. at 51).  However, that is precisely how Defendant referred to this individual—and in any event, the relevant point is not that Defendant cheated on his wife with a girlfriend or fiancée in Canada, but rather that Defendant fraudulently obtained money to fund his personal lifestyle with this woman.

Additionally, Defendant's arguments concerning the Guideline calculations for the money-laundering counts and false-statement counts (*id*. at 41-48) are based on an assumption that the Court would agree with his asserted offense level of 21 for the fraud counts, which is not the case.  Instead, for the reasons articulated above, the Court concludes that the adjusted offense level for "Count Group 1" (the fraud counts) is 27. Thus, neither the money-laundering counts nor the false-statement counts change the total offense level—which is 27.

IV.   <u>CONCLUSION</u>

For all the reasons set forth above, the Court reduces the total loss amount to $359,204.56, and it sustains Defendant's objections to application of U.S.S.G.

§§ 2B1.1(b)(9)(A) and 3B1.1.  Defendant's other objections are overruled or otherwise not resolved for the reasons set forth herein.  The total offense level is 27 and the criminal history category is I, which means that the Sentencing Guidelines recommend a prison sentence of 70-87 months, a supervised release term of one to three years, and a fine of $25,000 up to $250,000.

      SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:      November 16, 2022
             Rochester, New York

- 27 -